**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER C. CHARLES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Hon. Sharon Johnson Coleman |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) | No. 09-cv-5191 |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Christopher C. Charles ("Charles" or "Plaintiff") filed his Motion for Summary Judgment seeking reversal and remand of the decision by Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying Charles's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). This case presents the following issues: (1) whether the Administrative Law Judge ("ALJ") conducted a proper credibility determination concerning Charles's complaints of pain; (2) whether the ALJ erred in considering Charles's unsuccessful work attempt; (3) whether the ALJ properly explained her finding of Charles's residual functional capacity ("RFC"); (4) whether the ALJ conducted a proper analysis of the medical opinions; and (5) whether the ALJ erred by failing to recontact Dr. Medina, Charles's treating physician. For the reasons that follow, the Court denies Charles's motion.

# I. BACKGROUND

## A. Procedural History

Plaintiff initially applied for both DIB and SSI on May 9, 2005, alleging an onset date of February 5, 2005. (Administrative Record ("A.R.") at 138.) He later amended his application seeking an amended onset date of December 20, 2005 and requesting a closed period of benefits from December 20, 2003 to October 31, 2006. (Dkt. No. 15.) The Social Security Administration ("SSA") denied both applications on August 4, 2005. (A.R. at 115-18.) Plaintiff subsequently filed a request for reconsideration on September 14, 2005, which was denied on December 12, 2005. (*Id.* at 106-07, 110-12.) Plaintiff, through counsel, then requested a hearing before an ALJ. (*Id.* at 46-47.)

On December 6, 2007, ALJ Judith S. Goodie presided over the hearing at which Plaintiff appeared with his attorney. (*Id.* at 50.) On December 20, 2007, the ALJ issued a decision finding Plaintiff was not disabled and thus not entitled to either DIB or SSI. (*Id.* at 13-30.) The ALJ found that while Plaintiff was no longer able to perform his past relevant work as a machine operator, that Plaintiff has the RFC capable of performing a range of work at the sedentary level with additional limitations.[1] (*Id.* at 29.)

On January 30, 2008, Plaintiff requested a review of the ALJ's decision, which the Appeals Council denied on July 9, 2009. (*Id.* at 5-8, 11-12.) Consequently, the ALJ's decision

---

[1]Sedentary work is work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *20 CFR § 404.1567(a).*

became the final decision of the Commissioner of Social Security. Plaintiff filed the instant

action on August 24, 2009 seeking review by this Court pursuant to 42 U.S.C. §§ 405(g) and

1383(c).

       **B.**       **Hearing Testimony**

             **1.**       **Christopher C. Charles**

Plaintiff testified at the hearing that he suffered a chemical burn injury to his left foot on

December 20, 2003, after he accidentally stepped into a bucket of ink remover while working as

a machine operator at Royal Continental Box Company. (*Id.* at 61.) Plaintiff experienced sharp

pain that traveled up his left leg after the accident and sought treatment to relieve the pain. (*Id.*

at 70, 77.) Plaintiff was off work for several months following the accident and briefly returned

to work in September 2004. (*Id.* at 62, 83.) Upon his return to work, Plaintiff testified the he

was constantly in pain because his job required a lot of walking and standing. (*Id.* at 62.)

Plaintiff testified that he called in sick an average of 2-3 times a week during this period due to

pain. (*Id.* at 84.) Plaintiff did not use a cane when he returned work and was able to drive

himself to work. (*Id.* at 78.) Plaintiff continued working as a machine operator from

September 2004 until he was eventually terminated in February 2005. (*Id.* at 84.)

Plaintiff testified that he began his current job as a school bus driver in November 2006.

(*Id.* at 60.) He drives a bus equipped with an automatic transmission and works approximately

20 hours a week. (*Id.* at 60-61.) Plaintiff sits most of the time while working but will

occasionally assist the school children on and off the bus. (*Id.* at 63.) He does not lift the

children at any time. (*Id.*) Plaintiff testified that he was able to begin work as a school bus

driver because he stayed off his foot during the three years after his accident and that this helped

his foot heal.  (*Id.* at 69.)  Plaintiff continues to experience pain and takes over the counter pain medication two or three times a day.  (*Id.* at 63, 72.)

Plaintiff testified about his daily activities during the nearly three year period between his accident in December 2003 and his employment as a school bus driver in November 2006.  (*Id.* at 64-85.)  Plaintiff lived in a two story home with the bedrooms on the second floor and the kitchen and bathroom on the first floor.  (*Id.* at 64, 67-68.)  Plaintiff used the stairs to go from his second floor bedroom to the bathroom and to take meals in the first floor den.  (*Id.* at 67-68.)  Plaintiff did not assist with the cleaning, cooking, grocery shopping, or laundry during this three year period and was unable to wash and bathe himself.  (*Id.* at 65-6, 68, 84.)

Plaintiff testified that he constantly experienced very sharp pain that traveled up his leg. *Id.* at 70.)  To alleviate the pain, Plaintiff took prescription medication, received physical therapy, laid down for several hours, or elevated his foot.  (*Id.* at 71, 77, 79-80.)  He was able to walk about one-half block and stand for 20 minutes before needing to sit.  (*Id.* at 74.)  Sitting down would relieve the pain, but Plaintiff was only able to remain seated for one-half hour before feeling the need to stand.  (*Id.*)  Plaintiff could not explain why getting up from a seated position helped relieve the pain.  (*Id.* at 74-75.)  Plaintiff testified that he did not believe that he could hold any job during the three year period because the pain that he experienced was "too severe."  (*Id.* at 83.)

## 2. Cheryl R. Hoiseth - Vocational Expert[2]

Vocational expert Chery R. Hoiseth reviewed Plaintiff's file and was present at the December 6, 2007 hearing.  (*Id.* at 16, 51.)  She testified that Plaintiff's job as a machine

_____

[2]Ms. Hoiseth's name is misspelled as "Fisette" in the transcript.

operator was a heavy duty, semi-skilled work and that his school bus driver job is medium duty, semi-skilled work. (*Id.* at 86.) Ms. Hoiseth testified that Plaintiff was performing the school bus driver job at the light exertion level. (*Id.*)

The ALJ asked Ms. Hoiseth hypothetical questions about the type of work a person with Plaintiff's limitations would be able to perform. (*Id.*) The ALJ asked Ms. Hoiseth to assume an individual of Plaintiff's age, education, and work experience who was able to lift and carry up to 10 pounds, sit for six hours, stand and walk for two hours, and push or pull 10 pounds. The hypothetical also assumed that the person was able to occasionally crawl, and manage stairs and ramps while avoiding concentrated exposure to hazardous machinery, unprotected heights, and occasional balancing. (*Id.* at 87.) While Ms. Hoiseth concluded such an individual could not perform the prior job Plaintiff held as a machine operator, she testified that there were other jobs in the fourteen county regional area surrounding Chicago that such an individual could perform. (*Id.*) Ms. Hoiseth stated that there are approximately 3,000 information clerk positions; 1,000 order clerk positions; and 2,100 general office clerk positions in the fourteen county regional area. (*Id.* at 86-87.) The ALJ posed two additional hypothetical questions which: (1) added the ability to shift positions from sitting to standing and standing to sitting; and (2) added the need to elevate the left foot on a footstool when seated. (*Id.* at 87.) Ms. Hoiseth testified that the additional hypothetical questions had no impact and that the same jobs were available in the circumstances posed by all three hypothetical questions. (*Id.*)

### C. Medical Evidence

Plaintiff's medical records from various medical institutions were admitted into evidence at the hearing without objection. (*Id.* at 52-53.) Those records included reports from the

medical providers Plaintiff visited to alleviate his pain along with records from consulting physicians engaged by either the Bureau of Disability Determination Services ("DDS") or in connection with Plaintiff's Workers' Compensation claim.

### 1. Loyola University Medical Center

Plaintiff was treated by Dr. Gamelli of Loyola University Medical Center when Plaintiff went to the emergency room two days after sustaining the injury to his left foot. (*Id.* at 256.) Plaintiff remained at Loyola for two days, receiving antibiotics the first day and was discharged with prescription antibiotics on day two. Dr. Gamelli noted that throughout Plaintiff's stay, he "tolerated a general diet and complained of minimal pain." (*Id.*) Plaintiff was given Vicodin tablets for pain during his hospital stay and was discharged on December 24, 2003 with restrictions to elevate his foot whenever sitting or laying down, not to drive while taking narcotics or other medications, and to not return to work because further intensive wound care was required. (*Id.* at 256, 267.)

Plaintiff returned to Loyola on December 29, 2003 for physical therapy and follow up care and continued receiving follow up care at Loyola through November 2004. (*Id.* at 225-253.) Progress notes indicate Plaintiff initially complained of sharp, intermittent pain of 8/10.[3] (*Id.* at 253.) By early January 2004, Plaintiff reported that the prescription medication Norco was providing good pain relief. (*Id.* at 252.) In mid-February, Plaintiff was "healing well" and experiencing intermittent pain of about 4-5/10. (*Id.* at 247.)

After a short period of improvement, Plaintiff visited Loyola's pain clinic on March 9, 2004, complaining of persistent pain of 7/10 from the foot to the knee. (*Id.* at 246.) Plaintiff

---

[3]A pain level of 10/10 is the worst pain a person can experience.

received a lumbar sympathetic nerve block ("LSNB") treatment on March 17, 2004 and was discharged with "stead gait" and "in stable condition." (*Id.* at 242.) He returned to the pain clinic on March 31, 2004 and reported that the LNSB did not work. (*Id.* at 232.) The progress notes from May 12, 2004 indicate that Plaintiff received a second LSNB that provided no sustained relief. (*Id.* at 229.) The treating provider recommended Plaintiff continue physical therapy, undergo a functional capacity evaluation ("FCE"), and adjust to "sedentary type of work." (*Id.*) Plaintiff was later treated by Dr. Shilpa Bahethi, another Loyola physician, who along with Dr. Chinthagada, referred Plaintiff to the Rehabilitation Institute of Chicago for a FCE to determine Plaintiff's then current physical abilities. (*Id.* at 281-88.) On June 7, 2004, Dr. Chinthagada released Plaintiff to return to work based upon the results of the FCE. (*Id.* at 226.)

After Plaintiff returned to work in September 2004, he visited the pain clinic and complained of foot pain of 10/10. (*Id.* at 213.) Although Plaintiff complained of 10/10 pain and the inability to work, the treating physician found no evidence of swelling, no tenderness, and no evidence of any atrophy in Plaintiff's left foot. (*Id.* at 210-11.) The range of motion in Plaintiff's left foot was reported as normal and Plaintiff was able to walk without a limp and wear socks and shoes. (*Id.* at 207.) The progress notes indicate that the treating physician recommended Plaintiff undergo an electromyography ("EMG"), a second FCE, and a triple bone scan. (*Id.* at 209, 212.) The EMG revealed findings consistent with injury to the left superficial peroneal nerve. (*Id.* at 204-05.) In November 2004, after Plaintiff returned to work, Dr. Chinthagada ordered a triple bone scan, the results of which were "unremarkable" and indicated no evidence to suggest reflex sympathetic dystrophy ("RSD"). (*Id.* at 200-01.)

Plaintiff's last visit to the pain clinic at Loyola was on November 29, 2004. (*Id.* at 198.) During this visit, Plaintiff complained of 10/10 pain. (*Id.*) The progress notes indicate Plaintiff stated that the more he works the worse his foot hurts. (*Id.*) The notes also indicate that Plaintiff stated he feels 10/10 pain whether he is seated or standing. (*Id.*) Plaintiff requested that his providers complete papers regarding "work restrictions & disability." (*Id.*)

### 2. Rehabilitation Institute of Chicago

At the recommendation of the Loyola physicians, an FCE was conducted on May 26, 2004 at the Rehabilitation Institute of Chicago. The results revealed that Plaintiff exhibited certain inconsistencies and signs of sub-maximal effort. (*Id.* at 281.) Specifically, the FCE determined that Plaintiff's report of fatigue and pain did not correlate with the observed postural changes with the lifting tests, that Plaintiff's maximum lifting capabilities were self-limited based on subjective pain reports, and that kinesiophysical signs of effort were not observed during maximal lift tests and repetitive material handling. (*Id.*) The FCE indicated that Plaintiff was able to perform tasks requiring kneeling, squatting, stair climbing, crawling, and overhead work. (*Id.*) Plaintiff was not able to perform balancing activities due to pain in the left lower extremity. (*Id.*)

### 3. NeuroCenter

On December 1, 2004, nearly one year after Plaintiff's injury, he was examined by Dr. Jose L. Medina at the NeuroCenter. (*Id.* at 306.) Based on Plaintiff's description of constant pain, Dr. Medina performed an EMG and a nerve conduction study on December 3, 2004 to test Plaintiff for mononeurithis multiplex. (*Id.* at 308.) The findings indicated diminished left superficial medial peroneal nerve potential and mildly delayed and slow left deep peroneal nerve

potential.  (*Id.*)  Dr. Medina noted that Plaintiff reported that he has not responded to any procedures or medication and that his condition will remain unchanged with no improvement expected in the future.  (*Id.* at 307.)  Dr. Medina examined Plaintiff again on October 26, 2005 and noted that he was walking with an "assisting device" and that Plaintiff reported that his sleep was interrupted by pain.  (*Id.* at 304.)  Dr. Medina completed an Arthritic Report provided by the DDS, in which Dr. Medina diagnosed Plaintiff with mononeuritis multiplex and opined that Plaintiff was "totally disabled."  (*Id.* at 334, 336.)

### 4.     Dr. E. Richard Blonsky - Consulting Physician

On January 3, 2005, Plaintiff was examined by Dr. E. Richard Blonsky in connection with Plaintiff's Workers' Compensation claim.  (*Id.* at 312.)  Plaintiff described pain of 10/10 and told Dr. Blonsky that the pain began in his left foot, radiated upward through his thigh, and was very sharp, burning, and pinching.  (*Id.* at 313.)  Plaintiff stated that the pain lessens to 6/10 whenever he elevates his foot.  (*Id.*)  The pain level returns to 10/10 whether Plaintiff is sitting or on his feet.  (*Id.*)  Plaintiff reported that he is on a 20 minute standing or walking restriction and that he can walk whatever distance is necessary, as long as it is under 20 minutes. (*Id.*)  Plaintiff reported that sitting does not worsen his symptoms.  (*Id.*)

Dr. Blonsky's examination revealed a well nourished, well developed man, who did not appear to be in any distress throughout any portion of the examination.  (*Id.* at 314.)  Dr. Blonsky noted that Plaintiff's gait was normal and without a limp or antalgic posturing.  (*Id.*)  Dr. Blonsky observed Plaintiff perform a number of movements during the examination.  (*Id.* at 315.)  Plaintiff's strength was 5/5, normal and equal in all muscles of both lower limbs.  (*Id.*)  Dr. Blonsky summarized his findings by noting that there were no signs consistent with complex

regional pain syndrome Type I (reflex sympathetic dystrophy), nor any other neuropathic abnormality. (*Id.*) Dr. Blonsky reported that the hypersensitivity Plaintiff felt in and about the area of the scar was associated with some numbness due to loss of peripheral nerve endings as a result of the burn. (*Id.* at 315-16.)

Dr. Blonsky reviewed Plaintiff's medical records from Loyola including records of Plaintiff's physical therapy sessions and treatment and examinations by Dr. Gamelli, Dr. Chinthagada, and Dr. Rostafinski.[4] (*Id.* at 316-21.) Dr. Blonsky also reviewed the medical records from Plaintiff's treatment by Dr. Medina at the NeuroCenter. (*Id.* at 319.) Dr. Blonsky noted that the EMG results report by Dr. Medina were somewhat inconsistent with the results from the EMG performed at Loyola in October 2004. (*Id.*) Specifically, Dr. Blonsky noted that Dr. Medina's finding of mildly delayed and slow deep superficial medial peroneal nerve potential was inconsistent with the finding of left superficial peroneal nerve injury reported by the physicians at Loyola. (*Id.*) Dr. Blonsky found Dr. Medina's diagnosis of mononeuritis multiplex to be "illogical." (*Id.*)

Dr. Blonsky concluded that Plaintiff likely has some degree of superficial peroneal nerve injury based upon Dr. Blonsky's examination and his review of Plaintiff's medical history and records. (*Id.*) Dr. Blonsky noted that Plaintiff demonstrated excellent and uncompromised strength in his left lower extremity. (*Id.* at 315.) Dr Blonsky reported that while Plaintiff had numerous subjective complaints of pain at the 10/10 level, at no time during the examination did

_____

[4]Dr. Rostafinski, Plaintiff's reviewing psychologist at Loyola, evaluated Plaintiff in June 2004. (A.R. 317.) The records from Dr. Rostafinski's evaluation were not included in the Certified Copy of the Administrative Record. (*Id.* at 55.) At the December 6, 2007 hearing, Plaintiff's counsel informed the ALJ that Plaintiff was not alleging any mental work limitations. (*Id.*)

Plaintiff exhibit pain behaviors that were consistent with his description. (*Id.* at 316.) Dr. Blonsky reported that Plaintiff exhibited "symptom magnification" and was capable of returning to work on a full-time basis without restriction. (*Id.* at 318-19.)

### 5. Dr. Peter Biale - Consulting Physician

On July 19, 2005, Dr. Peter Biale conducted a consultative examination of Plaintiff at the request of the DDS. (*Id.* at 322.) Dr. Biale did not have the benefit of Plaintiff's complete medical history and only received the treatment records from Dr. Medina. (*Id.* at 25.) Dr. Biale's medical findings were similar in many aspects to those of Dr. Blonsky. (*Id.* at 323.) Dr. Biale noted that Plaintiff walks with a limp and uses a non-prescribed regular cane. (*Id.* at 322.) Dr. Biale reported that Plaintiff was able to walk more than fifty feet without the use of the cane. (*Id.* at 324.) Plaintiff possessed a full range of motion of all joints and no redness, swelling, or thickening was noted. (*Id.* at 323.) Plaintiff was able to bear his own weight but had difficulty squatting and performing a heel and toe walk. (*Id.*) Dr. Biale found no signs of localized muscle wasting, twitching, atrophy, paralysis or involuntary movement. (*Id.* at 324.) Dr. Bialie's clinical impressions were that Plaintiff had a status-post work-related injury in the left foot and that Plaintiff showed borderline readings for hypertension. (*Id.*)

### 6. DDS Physicians - Drs. Boyd McCracken and Dr. E.W. Donelan[5]

In July 2005, DDS physician Dr. Boyd McCracken reviewed Plaintiff's medical records and conducted an RFC assessment. (*Id.* at 326.) In a report dated July 28, 2005, Dr. McCracken accepted the mononeuritis multiplex and hypertension diagnoses and determined that Plaintiff

---

[5]Dr. John Tomassetti, a DDS psychiatrist, also conducted a psychiatric review and determined Plaintiff had no medically determinable mental impairment. (A.R. 339.)

had the RFC to: (1) occasionally lift and/or carry 20 pounds; (2) frequently lift and/or carry 10 pounds; (3) stand and/or walk about 6 hours in an 8-hour workday; (4) sit about 6 hours in an 8-hour workday; and (5) push or pull the same weight and with the same frequency that Plaintiff can lift and/or carry.  (*Id.* at 327.)  Dr. McCracken based his findings on the records provided by sources who either treated or examined Plaintiff.  (*Id.* at 332.)  Dr. McCracken noted that one source was an EMG study consistent with a diagnosis of mononeuritis multiplex.  (*Id.* at 333.)  Dr. McCracken further noted that the findings from a second source, a neurologist at the Loyola pain clinic, were more consistent with damaged nerve endings of the peroneal nerve caused by Plaintiff's burn injury.  (*Id.*)  Plaintiff requested reconsideration of Dr. McCracken's findings.  (*Id.* at 337.)  After reviewing the record evidence and Dr. McCracken's report, DDS physician, Dr. E.W. Donelan, affirmed Dr. McCracken's assessment.  (*Id.* at 338.)

## II.     LEGAL STANDARDS

### A.     Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  When the Appeals Council denies review, as here, the ALJ's decision constitutes the Commissioner's final decision. *Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009).  In such instances, the ALJ's decision is subject to judicial review by the district court.  *Norbert v. Skarbek*, 390 F.3d 500, 503 (7th Cir. 2004).  Judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching her decision and whether there is substantial evidence in the record to support the findings.  *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Evidence is substantial if it is sufficient for a reasonable person to accept as adequate to support the decision.

*Johansen v. Barnhart*, 314 F.3d 467, 470 (7th Cir. 2002). Even where reasonable minds could differ concerning whether a claimant is disabled, a reviewing court will affirm an ALJ's denial of benefits if the ALJ's decision has adequate support. *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009). The ALJ is not required to discuss every piece of evidence, but must articulate, at least minimally, her analysis so that this Court can follow her reasoning. *Villano*, 556 F.3d at 562. If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Id.*

### B.    Disability Standards

In order to qualify for disability benefits, a claimant must be found "disabled" under the Social Security Act ("the Act"), 42 U.S.C. § 301 *et seq*. *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). The Act defines "disability" as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months. *Barnhart*, 425 F.3d at 351; *see also* 42 U.S.C. §§ 423(d), 416(I), and 1382c. An ALJ must evaluate a claim for disability under the mandatory five-step sequential analysis. *Simila v. Astrue*, 573 F.3d 503, 512 (7th Cir. 2009); *see also* 20 C.F.R. §§ 404.1520(a)(4) (DIB), 416.920(a)(4) (SSI). The five-step analysis requires the ALJ to examine: (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the listed impairments, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant can perform his past work; and (5) whether, given the claimant's RFC, age, education, and work experience, the claimant is capable of performing work in the national economy. *Simila*, 573 F.3d. at 512-13. To determine whether the claimant is able to perform his past work or is

capable of performing other work (steps four and five), the ALJ must assess the claimant's residual functioning capacity ("RFC"). *See* 20 C.F.R. §§ 404.1520(e), 404.1560(b)-(c), 416.920(e), 416.960(b)-(c). A claimant's RFC is the most the claimant can still do despite his limitations. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ must determine a claimant's RFC based on all the claimant's impairments and all the relevant evidence in the record. *Simila,* 573 F.3d at 513; s*ee also* 20 C.F.R. §§ 404.1545(a), 416.945(a). A finding of disability requires either an affirmative answer at step three or that the claimant is unable to perform any work in the national economy. *Briscoe*, 425 F.3d at 352. A claimant bears the burden of proof at steps one through four, and at step five the burden shifts to the Commissioner. *Id.*

### III.    The ALJ's Decision

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity after the alleged onset of disability. The ALJ deemed Plaintiff's temporary return to work as a machine operator as an "unsuccessful work attempt" and not fatal to his claim. At step two, the ALJ found that Plaintiff had multiple severe impairments due to hypertension, status post chemical burn to the left foot, and mononeuritis multiplex of left foot or alternatively, superficial peroneal nerve injury to the left foot. At step three, the ALJ concluded that none of Plaintiff's impairments met or medically equaled any of the listed impairments. The ALJ then found that Plaintiff had an RFC for sedentary work based on the objective medical evidence, Plaintiff's course of treatment, his daily activities, his work history, and the medical expert opinions. Accordingly, at step four, the ALJ concluded that Plaintiff could not perform his past work as a machine operator. At step five, however, the ALJ accepted the vocational expert's testimony and concluded that there were a substantial number of jobs in the national economy at the

sedentary level with imposed limitations that Plaintiff could perform. Consequently, the ALJ ultimately found that Plaintiff was not disabled.

## IV. DISCUSSION

### A. The ALJ's Credibility Determination

#### 1. Plaintiff's Complaints of Pain

Plaintiff first argues that the ALJ erred by failing to conduct a proper analysis of Plaintiff's complaints of pain in accordance with SSR 96-7p. (Dkt. No. 15 p. 8.) SSR 96-7p provides a list of factors that an ALJ must consider when evaluating the credibility of a claimant's complaints of pain and other symptoms and further provides that the ALJ must state her credibility findings in writing. *See* 1996 SSR LEXIS 4. Plaintiff alleges that the ALJ did not consider the factors enumerated in SSR 96-7p when assessing Plaintiff's credibility concerning his complaints of pain. (Dkt. No. 15 p. 9.) The Commissioner asserts that the ALJ did not completely reject or ignore Plaintiff's complaints of pain, but rather did not fully credit his testimony regarding the intensity, persistence, and limiting effects of the pain given other evidence in the record. (Dkt. No. 16. p. 11.) This Court finds the ALJ properly considered Plaintiff's complaints of pain in reaching her finding that Plaintiff's statements were not entirely credible.

During the December 6, 2007 hearing, Plaintiff testified that he was unable to work because of the sharp and constant pain he experienced as a result of his injury. The ALJ based her credibility finding, in part, on the inconsistent statements Plaintiff made during the hearing. (A.R. 26.) The ALJ noted that while Plaintiff represented himself as being completely dependent upon others during his alleged period of disability that he was able to perform many

activities. (*Id.*) Plaintiff testified that he did no chores around the house during the three year period of his alleged disability. (*Id.* at 26-27.) This testimony conflicted with the information Plaintiff provided on the Activities of Daily Living Questionnaire, which stated that Plaintiff cleaned house, made the bed, and did laundry. (*Id.* at 26-27, 65-66, 159.) Plaintiff also offered conflicting testimony regarding his ability to drive. At one point during the hearing, Plaintiff testified that he did not drive during his alleged period of disability because he was "in too much pain to be lifting my foot and going up and dealing with the pedals" in a car that was equipped with an automatic transmission. (*Id.* at 27, 69.) Later in the hearing, Plaintiff testified that he did drive during the five month period when he temporarily returned to his old job at the box factory. (*Id.* at 27, 78.) The ALJ questioned Plaintiff's testimony that he was incapable of doing almost anything during his alleged period of disability when he also testified that he was able to perform his old job, which required significant lifting, standing and walking for nearly five months, even allowing for frequent absences due to pain. (*Id.* at 27.)

The ALJ found that Plaintiff's reports of pain were not supported by the objective medical evidence. (*Id.*) Plaintiff testified that he could only sit for half an hour before needing to stand, which was inconsistent with the medical findings that Plaintiff's pain was not triggered or increased with sitting. (*Id.* at 27, 74, 313.) The ALJ noted that Dr. Blonsky opined that Plaintiff magnified his symptoms and that the Rehabilitation Institute observed signs of sub-maximal and self-limiting effort. (*Id.* at 27, 281.) The ALJ concluded that there was no evidence in the medical records indicating that Plaintiff needed to elevate his foot. (*Id.* at 27.) The ALJ apparently overlooked the discharge notes from Plaintiff's two-day stay at Loyola in December 2003, which did require Plaintiff to elevate his left leg whenever sitting or

laying down and instructed him not to return to work. (*Id.* at 256, 267.)

The ALJ based her credibility assessment on Plaintiff's statements and the objective medical evidence in the record. An ALJ may disregard a claimant's assertions of pain if she legitimately finds them not credible. *Schmidt v. Astrue*, 496 F.3d 833, 843-44 (7th Cir. 2007). Additionally, an ALJ may properly discount portions of a claimant's testimony based on discrepancies between the claimant's testimony and objective medical evidence. *Powers v. Apfel*, 207 F.3d 431, 435-36 (7th Cir. 2000). An ALJ's credibility determination will only be reversed where it is "patently wrong." *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004). Here, the ALJ followed SSR 96-7p by considering Plaintiff's daily activities, which included his testimony that he navigated stairs on a daily basis to take his meals and use the bathroom, his testimony describing his pain and that walking and standing caused it to worsen, and the measures Plaintiff testified that he took to help relieve the pain. Although the ALJ overlooked evidence that Plaintiff was instructed to elevate his foot upon his discharge from the hospital when his foot was still healing, this error was harmless as the medical staff at Loyola placed no restrictions on Plaintiff when he was advised on May 12, 2004 to adjust to sedentary work. (A.R. 229.) The ALJ referred to Plaintiff's inconsistent and contradictory statements, the medical findings, and Plaintiff's record of his daily activities in reaching her determination that Plaintiff's statements were not "entirely credible." (*Id.* at 26-28.) The ALJ followed SSR 96-7p and we find no error in her credibility determination.

### 2. Plaintiff's Unsuccessful Work Attempt

Plaintiff alleges that the ALJ erred by considering his unsuccessful work attempt in reaching her finding that Plaintiff was not entirely credible. (Dkt. No. 15 p. 10.) The ALJ

determined Plaintiff's testimony that he was unable to perform any work at all was inconsistent with the work he actually performed during his unsuccessful work attempt. (A.R. 26-28.) Plaintiff testified that during the nearly five months that he returned to work, that he drove himself to a job that required significant lifting, standing, and walking and that he performed his duties without the use of a cane. (*Id.* at 62, 78, 83-84.) The ALJ found Plaintif's statements about his inability to work at any level less than credible given that he was able to perform his heavy job for five months despite frequent absences. (*Id.* at 26-27.) Plaintiff appears to argue that since evidence of an unsuccessful work attempt is not "proof positive" that an individual is disabled, such evidence should not be relied upon in assessing credibility. (Dkt. No. 15 pp. 10-11.) In support, Plaintiff relies upon authorities holding that individuals with disabilities manage to perform work beyond their actual capabilities before eventually being overtaken by their limitations. (*Id.* at 11.) None of the these authorities, however, have held that an individual's daily activities during the "unsuccessful work attempt" *cannot* be considered in determining an individual's credibility. On the contrary, an individual's daily activities, including any work he or she performs, is a proper factor to consider in credibility determinations. *See, e.g., Stich v. Astrue,* 2010 U.S. Dist. LEXIS 7541, at * 29 (E. D. Wis. Jan. 31, 2010) ("when work is not substantial gainful employment, the ALJ can consider this a factor in his determination of credibility.") (internal citations omitted); *see also* 1996 SSR LEXIS 4 (listing "efforts to work" as one of the factors to consider in evaluating credibility). The ALJ did not err in considering Plaintiff's testimony about the work he performed during his unsuccessful work attempt when she assessed Plaintiff's credibility.

### B.      Plaintiff's Residual Functional Capacity Finding

Plaintiff next argues that the ALJ erred by failing to explain how she arrived at her

RFC finding for sedentary work.  (Dkt. No. 15 p. 12.)  The ALJ determined that Plaintiff had

the RFC to lift and/or carry ten pounds, stand and/or walk two hours in an eight hour workday,

sit up to six hours in an eight hour workday, and push/pull up to ten pounds.  She also found

that Plaintiff was capable of shifting positions from sitting to standing and back, and could

remain seated for at least 45 minutes of each hour.  The ALJ determined that Plaintiff may be

off task for up to 20% of the day in addition to normal breaks.  The RFC finding included

several postural limitations which limited Plaintiff to occasional climbing of stairs and ramps,

occasional crawling, and occasional balancing, and required Plaintiff to avoid ladders and

concentrated exposure to hazardous machinery and unprotected heights.  (A.R. 23-24.)

Plaintiff alleges that the ALJ gave "significant weight" to Drs. Blonsky, Biale,

McCracken, Donelan, and Tomasetti but failed to explain how she factored in  Dr. Biale's

findings.  (Dkt. No. 15 p. 12.)  Plaintiff further alleges that the ALJ erred by ignoring the

postural limitations as assessed by the state agency physicians, Drs. McCracken and Donelan.

(*Id.* at 12-13.)  Finally, Plaintiff alleges that no medical opinion supports the ALJ's finding that

Plaintiff can remain seated for at least 45 minutes of each hour.  (*Id.* at 13.)

In reaching her RFC finding, the ALJ incorporated the medical opinions of the

aforementioned doctors and those of the Rehabilitation Institute of Chicago.  (A.R. 25.)  The

opinions all concluded that Plaintiff was capable of work at either the light to medium exertion

level with additional postural and environmental limitations.  (*Id.*)  The ALJ explained that she

considered the conflicting opinions offered by Drs. Blonsky and Medina as to Plaintiff's

impairments and further noted that Drs. Biale, McCracken, and Donelan reached their findings without full access to Plaintiff's medical records and with the benefit of Dr. Medina's report only. (*Id.*) The ALJ also considered Dr. Biale's observation that Plaintiff was capable of walking more than fifty feet without a cane. (*Id.*) Upon considering Plaintiff's symptoms along with the objective medical evidence, the ALJ's concluded Plaintiff was capable of work at the sedentary level, which was lower and more generous than the exertional level of work determined by the medical providers. (*Id.*) The ALJ relied upon Dr. McCracken's opinion that Plaintff could sit for 6 hours in an 8 hour day in reaching her finding that Plaintiff could remain seated for 45 minutes of each hour. This finding flows from the fact that an individual must sit for at least 45 minutes in each hour to be capable of sitting for a total of 6 hours in an 8 hour workday. While the ALJ did not detail her reasons for lowering the exertional level and rejecting the postural limitations related to stooping, kneeling, and crouching, the ALJ did provide a sufficient explanation to support her RFC finding for sedentary work. An ALJ is only required to provide a "logical bridge" between the evidence and conclusions and is not required to address every piece of evidence in detail. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). The ALJ supported her RFC finding with substantial evidence and we find no error in her conclusion**.**

C.      **The ALJ's Analysis of Medical Opinions**

Plaintiff alleges that the ALJ failed to properly analyze the medical opinions by assigning "significant weight" to Dr. Blonsky's opinion while attributing only "minimal weight" to the opinion provided by Dr. Medina. (Dkt. No. 15 pp. 14-15.) Plaintiff argues that the ALJ failed to consider that Dr. Blonsky may have been biased since he was hired by a

Workers' Compensation carrier and because of certain statements Dr. Blonsky made about Dr. Rostafinksi, who conducted Plaintiff's psychological evaluation.  (*Id.* at 14.)

The ALJ considered the objective medical evidence and assigned minimal weight to Dr. Medina's opinion because he did not provide the results of a physical examination and did not provide a residual functional capacity.  (A. R. 24.)  Dr. Blonsky, to whom the ALJ assigned significant weight, conducted a comprehensive physical examination and provided a detailed report of the results.  (*Id.* at 24, 312.)  Dr. Blonsky also conducted an extensive review of Plaintiff's medical records including those provided by Loyola, the Rehabilitation Institute of Chicago, and Dr. Medina.  (*Id.* at 312.)

Dr. Blonsky also opined that "Dr. Rostafinski appears to have lost some objectivity in his evaluation of Mr. Charles."  (*Id.* at 318.)  It is not clear from the record why Dr. Blonsky, who was hired as the consulting expert, opined on Plaintiff's psychological examination. Nonetheless, Dr. Blonsky's comments do not, as Plaintiff alleges, suggest that Dr. Blonsky was biased and "set on minimizing the severity of Claimant's condition."  (Dkt. No. 15 p. 14.) Further, as the ALJ noted, Dr. Blonsky's observations were consistent with the findings from the Rehabilitation Institute of Chicago that Plaintiff's reports of pain did not correlate with observed postural changes.  (A. R. 231.)

We find that the ALJ provided a sufficient explanation for analyzing and assigning different weights to each of the medical opinions contained within the record.

### D.     Recontacting Dr. Medina

Lastly, Plaintiff alleges the ALJ erred by not recontacting Dr. Medina to seek additional medical evidence.  (Dkt. No. 15 p. 15.)  As previously discussed, the ALJ assigned minimal

weight to Dr. Medina's opinion because he did not report the results of a physical examination and did not offer an opinion concerning Plaintiff's residual functional capacity. (A. R. 24.) Plaintiff argues that the ALJ was required to recontact Dr. Medina pursuant to 20 C.F.R. Section 404.1512, to obtain this information. (Dkt. No. 15 p. 15.) Plaintiff is mistaken. An ALJ need only recontact medical sources when the evidence in the record is inadequate to determine whether a claimant is disabled. *See, e.g., Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004); *see also* 20 C.F.R. Section 404.1512(e). Here, the evidence was adequate for the ALJ to find that Plaintiff was not disabled, and the ALJ acted within her discretion in deciding not to recontact Dr. Medina.

## V. CONCLUSION

For the above stated reasons, this Court denies Plaintiff's Motion for Summary Judgment.

IT IS SO ORDERED.

October 25, 2010

_____
Dated

_____
Hon. Sharon Johnson Coleman
United States District Court